UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| PRIDE CENTER OF TERRE HAUTE, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> INDIANA STATE UNIVERSITY VICE ) <br> PRESIDENT FOR UNIVERSITY ) <br> ENGAGEMENT, ) <br> INDIANA STATE UNIVERSITY ) <br> EXECUTIVE DIRECTOR, CAREER ) <br> SERVICES, ) <br> ) <br> Defendants. ) | No. 2:25-cv-00445-JPH-MG |

**ORDER DENYING PRELIMINARY INJUNCTION**

The Pride Center of Terre Haute is a non-profit organization located near the campus of Indiana State University that was established to support and advocate for the LGBTQ+ community in the greater Terre Haute area. The Pride Center's paid employees—ISU students participating in a work-study program involving government funds administered through ISU—are required to be "LGBTQIAP+ affirming." ISU recently ended its work-study partnership with the Pride Center, so ISU students are no longer able to work there as part of the work-study program. The Pride Center alleges that ISU's decision was motived by viewpoint discrimination and therefore violated the First Amendment. The Pride Center seeks a preliminary injunction that would require ISU to reinstate work-study funding for the Pride Center's student employees. Dkt. [11]. As discussed below, the Pride Center is not likely to be able to show that ISU discriminated against it because of the Pride Center's

1

viewpoint supporting LGBTQ+ people. Therefore, its motion for a preliminary injunction is **DENIED**.

# I.
# Facts and Background

The parties have filed affidavits and other documentary evidence, the relevant parts of which are uncontested, so these facts are based on that designated evidence. *See* dkt. 20; dkt. 24.[1]

The Pride Center is a non-profit in Terre Haute that "advocates for and provides support and resources to the LGBTQ+ community in the greater Terre Haute area." Dkt. 20-1 at 1–2 (declaration of Pride Center President-elect Ian Braly). The Pride Center's services are open to anyone and include facilitating STI testing and hosting activities like educational seminars, game nights, trivia contests, and baking classes. *Id.* at 2. The Pride Center opened in 2021 and was staffed in part by ISU interns and work-study students starting in 2022. *Id.* at 3.

ISU's work-study students were paid either by ISU through its Sycamore Community Works Program or by federal work-study funds. *Id.* While the

---

[1] The Pride Center has not requested an evidentiary hearing, *see* dkt. 11, and informed the Court that one was not necessary, dkt. 15. *Cf. Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 814 (7th Cir. 2002) ("[T]he party seeking the evidentiary hearing must demonstrate that it has and intends to introduce" relevant evidence.). While the record is understandably underdeveloped at this stage, the parties do not dispute the material facts that are available, but rather whether they show a likelihood of success on the merits. *See Dexia Credit Local v. Rogan*, 602 F.3d 879, 884 (7th Cir. 2010) (A hearing is required only if "one is called for as a result of a fact issue created by" the preliminary-injunction filings.).

students work at and are supervised by the partner organization, they are ISU employees. Dkt. 24-2 at 1; dkt. 24-3 at 1.

The Pride Center's job descriptions for the work-study positions state that applicants, "Must be LGBTQIAP+ affirming and culturally responsive." Dkt. 20-2 at 167–183; 235–250 (job descriptions for student work-study positions at the Pride Center); dkt. 24-8 (same). The job descriptions also included a "[s]trong preference for candidates with knowledge of LGBTQ+ issues and experience with programming and advocacy." *Id.*[2]

In the spring of 2025, ISU began reviewing its work-study partner contracts "with special attention to several recent directives from the Department of Justice and the Indiana state legislature" about potentially discriminatory activities and affiliations. Dkt. 24-5 at 3 (Lutz decl.). In July 2025, ISU Vice President for University Engagement Nancy Rogers reviewed a list of work-study partner organizations and put the Pride Center on hold:

> From: Nancy Rogers <Nancy.Rogers@indstate.edu>
> Date: Monday, July 28, 2025 at 10:24 AM
> To: Carrie Lutz <Carrie.Lutz@indstate.edu>
> Subject: RE: Federal work study partner list
>
> Carrie,
>
> Do we actually have a student working at the Burmese American Community Institute? If not, please take them off the list.
>
> For now, can we go ahead with everyone except BACI and the Pride Center?
>
> Does anyone in the CC have a contact at Ball State? I'd be interested in learning what they are doing in regards to any community organizations that have a DEI focus.

EXHIBIT 14

---

[2] The Pride Center's strategic plan included "prioritiz[ing] community members who are queer, transgender, and people of color for board member, volunteer, intern, staff, and facilitator opportunities." Dkt. 20-1 at 4. ISU was not aware of that language when it terminated its partnership with the Pride Center. Dkt. 25 at 7.

Dkt. 20-2 at 199.

The next day, the United States Department of Justice issued a memo to federal agencies "clarif[ying] the application of federal antidiscrimination laws to programs or initiatives that may involve discriminatory practices." Dkt. 20-2 at 185. The memo recommended "non-binding best practices to help entities avoid the risk of violations" of federal antidiscrimination laws, including not using "protected characteristics for employment, program participation, or other similar activities, opportunities, or benefits." *Id.* at 186. It also identified "unlawful discriminatory policies and practices":

> The following is a non-exhaustive list of unlawful practices that could result in revocation of grant funding. Federal funding recipients may also be liable for discrimination if they knowingly fund the unlawful practices of contractors, grantees, and other third parties.
>
> **A.    Granting Preferential Treatment Based on Protected Characteristics**
>
> **1.    What Constitutes Unlawful Preferential Treatment?**
>
> Preferential treatment occurs when a federally funded entity provides opportunities, benefits, or advantages to individuals or groups based on protected characteristics in a way that disadvantages other qualified persons, including such practices portrayed as "preferential" to certain groups. Such practices violate federal law unless they meet very narrow exceptions.

*Id.* at 188. The memo recommended that agencies "[m]onitor third parties that receive federal funds to ensure ongoing compliance, including reviewing program materials, participant feedback, and outcomes to identify potential discriminatory practices," and "[t]erminate funding for noncompliant programs." *Id.* at 193.

On August 8, 2025, ISU informed the Pride Center's President, Katie Lugar, that it would no longer fund work-study positions at the Pride Center:

4

> **Subject:** Student employment follow-up
> **Date:** Friday, August 8, 2025 at 11:20:02 AM Eastern Daylight Time
> **From:** Carrie Lutz
> **To:** katie.luger.pcth@gmail.com
> **Attachments:** image001.png
>
> Hi, Katie.
>
> Guidance issued by the U.S. Department of Justice for recipients of federal funding identifies "Best Practices" to avoid discriminatory practices. This Guidance advises public universities that fund student employment positions that support programs or activities that allocate benefits or roles based on protected characteristics, including sexual orientation or gender identity, is unlawful. Consistent with this Guidance from the DOJ, Indiana State may not require applicants to hold a particular identity-based viewpoint.
>
> Based on this, we will not be funding Federal Work Study or Sycamore Community Works positions this fiscal year 25-26.
>
> Thanks,
> Carrie
>
> **Carrie Lutz**
> *Executive Director*
> *Career Services*
> **Indiana State University**

*Id.* at 184. After the Pride Center asked ISU to reconsider because it does "not hire based on identity" and "follow[s] recent guidance of the [Department of Justice]", ISU responded:

> The decision was made in consultation with our Legal Counsel based on their interpretation of the Department of Justice memo. We will not be funding Federal Work Study or Sycamore Community Works positions this fiscal year 2025–26.

Dkt. 20-2 at 209–10.

The Pride Center filed this case against Indiana State's Vice President for University Engagement and Executive Director, Career Services ("ISU") alleging First Amendment violations against ISU. Dkt. 1. The Pride Center seeks a preliminary injunction that would require Defendants "to reinstate, and

5

continue to provide, funding for student-employees at the Pride Center . . . as it has in the past."  Dkt. 11.

## II.
## Preliminary Injunction Standard

Injunctive relief under Federal Rule of Civil Procedure 65 is "an exercise of very far-reaching power, never to be indulged in except in a case clearly demanding it."  *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021).  To obtain such extraordinary relief, the party seeking the preliminary injunction carries the burden of persuasion by a clear showing.  *See id.*; *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

Determining whether a plaintiff "is entitled to a preliminary injunction involves a multi-step inquiry."  *Int'l Ass'n of Fire Fighters, Local 365 v. City of E. Chi.*, 56 F.4th 437, 446 (7th Cir. 2022).  "As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied."  *Id.*  "If these threshold factors are met, the court proceeds to a balancing phase, where it must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties."  *Cassell*, 990 F.3d at 545.  This "involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and

vice versa." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). "In the final analysis, the district court equitably weighs these factors together, seeking at all times to minimize the costs of being mistaken." *Cassell*, 990 F.3d at 545.

## III
## Analysis

The Pride Center asks the Court to enter a preliminary injunction that would effectively reverse ISU's decision to no longer make work-study funds available to ISU students who are employed at the Pride Center. Dkt. 20 at 17-19, 28. The Pride Center argues that ISU's decision "is a blatant violation of the First Amendment's prohibition on the government punishing an organization for its expressive activities, viewpoint, and expressive association." Dkt. 20 at 2. The Pride Center further contends that ISU's decision burdens the Pride Center's expression based on its content and burdens its right of association, so the Court must review ISU's decision under the "strict scrutiny" standard. *Id.* at 17. ISU responds that the decision was not based on the Pride Center's viewpoints or speech but related to its desire to comply with applicable laws regarding discriminatory practices. Dkt. 25 at 19–21. ISU further argues that choosing to not partner with the Pride Center is not stifling speech but instead choosing not to subsidize it, which does not implicate the First Amendment absent viewpoint-based discrimination. *Id.* at 22–24. In reply, the Pride Center contends that ISU's work-study partnership was not a subsidy, so the speech-subsidy cases do not apply. Dkt. 27 at 10–12. The Pride Center further argues that even if "speech subsidy" cases apply, ISU's

7

actions still violated the First Amendment under the strict scrutiny standard as viewpoint-based discrimination. *Id.*

The First Amendment "protects the right to be free from government abridgment of speech." *Ysursa v. Pocatello Educ. Ass'n,* 555 U.S. 353, 358 (2009). It does not, however, require the government "to assist others in funding the expression of particular ideas." *Id.*; *see Lyng v. Int'l Union, UAW*, 485 U.S. 360, 368 (1988) ("We have held in several contexts including the First Amendment that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right.").

Here, ISU's funding of work-study positions at the Pride Center is a subsidy because it provides government funds through ISU for ISU students to work for the Pride Center. *See Legal Servs. Corp. v. Velazquez,* 531 U.S. 533, 536, 544 (2001) (government funds granted to nonprofit organizations for attorneys to provide legal aid clients was a subsidy); *Rust v. Sullivan,* 500 U.S. 173, 192–93 (1991) (government funds provided to private entities for doctors to provide family planning services was a subsidy). Most recently, the Seventh Circuit considered the COVID-era Paycheck Protection Program, which provided forgivable loans to "keep employees on the payroll" but excluded businesses that "[p]resent live performances of a prurient sexual nature." *Camelot Banquet Rooms, Inc. v. U.S. Small Business Admin.*, 24 F.4th 640, 644–46 (7th Cir. 2022). That exclusion was not a regulation of protected expression; instead, Congress had "simply chosen not to subsidize it." *Id.* (holding that the adult-entertainment exclusion did not violate the First

8

Amendment because it was "not trying to regulate or suppress plaintiffs' adult entertainment."). *Id.* Under that reasoning, ISU's work-study program is a subsidy rather than a regulation. *See id.* ("The Supreme Court has repeatedly drawn a line between government regulation of speech, on one hand, and government subsidy of speech, on the other.").

A denial of subsidies generally does not violate First Amendment protections for speech and association. *Ysursa*, 555 U.S. at 355 ("The First Amendment prohibits government from 'abridging the freedom of speech'; it does not confer an affirmative right to use government payroll mechanisms for the purpose of obtaining funds for expression."); *Lyng*, 485 U.S. at 368 ("[T]he strikers' right of association does not require the Government to furnish funds to maximize the exercise of that right."). Even more, "speaker-based discrimination is permissible when the state subsidizes speech." *Wisc. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 646 (7th Cir. 2013). That's because choosing who to subsidize is "merely funding one activity to the exclusion of another," so it does not violate the First Amendment "unless it discriminates on the basis of ideas." Id.; *see Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983) ("[S]election of particular entities or persons for entitlement to this sort of largesse is obviously a matter of policy and discretion not open to judicial review unless in circumstances which here we are not able to find."). For example, the government can exclude adult-entertainment venues from a payroll subsidy even though they are "engaging in expressive activity protected by the First Amendment." *Camelot*, 24 F.4th at

9

646 ("The problem with plaintiffs' First Amendment claim . . . is that Congress is not trying to regulate or suppress plaintiffs' adult entertainment. It has simply chosen not to subsidize it.").

Accordingly, a decision not to subsidize "only violates the First Amendment if it discriminates on the basis of viewpoint." *Walker*, 705 F.3d; *cf. Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015) ("[L]aws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference *reflects a content preference*." (emphasis added)). Prevailing on that basis is an uphill battle for the Pride Center because, "as far as [the Seventh Circuit] can tell, the Supreme Court has never struck down the denial of" a "selective subsidy" that did not regulate speech. *Camelot*, 24 F.4th at 646.

On the limited preliminary-injunction record here, the Pride Center has not shown a substantial likelihood of success in proving viewpoint discrimination. It argues that ISU has admitted "in no uncertain terms" that it terminated its partnership with the Pride Center "because the Pride Center is generally 'affirming' of the LGBTQ population." Dkt. 20 at 20 (citing dkt. 20-2 at 43–45, 62–64 (Lutz 30(b)(6) dep.)). But that is not what the cited deposition reflects. Instead, ISU testified that it looked at the Pride Center's job description and identified as the "primary concern" its requirement that work-study applicants "must be LGBTQIAP+ affirming." Dkt. 20-2 at 43–45, 62–64. ISU's testimony is thus that it was not the LGBTQ+ content of that affirmation that drove its decision, but that the Pride Center *required* the affirmation of its work-study students in tension with federal and state legal guidance. *See id.*

10

at 42–43 (explaining that ISU "look[ed] at hiring practices, looking at the job description and what they're requiring of students to do").

The Pride Center next argues that its work-study participation did not "risk[ ] running afoul of any state or federal law or regulation," so ISU cannot cite the Department of Justice's guidance as a "compelling interest" to satisfy strict scrutiny. Dkt. 20 at 20–21. The denial of a subsidy, however, does not trigger strict scrutiny absent content discrimination. *Ysursa*, 555 U.S. at 358; *Reed*, 576 U.S. at 170. And ISU has designated evidence that it terminated the partnership with the Pride Center on advice of legal counsel related to Department of Justice guidance about preferential treatment based on protected characteristics. Dkt. 24-1 at 39 (Lutz 30(b)(6) dep. at 38) (testifying that "the Pride Center was terminated" from the work-study program "because of the guidance issued by the Department of Justice"); dkt. 24-12 at 2 (email informing the Pride Center that ISU's decision not to fund the Pride Center's positions was based on the Department of Justice guidance); dkt. 24-13 at 2 (same).[3]

---

[3] ISU also relies on the Pride Center's internal strategic plan, which included "prioritiz[ing] community members who are queer, transgender, and people of color for board member, volunteer, intern, staff, and facilitator opportunities." Dkt. 20-1 at 4. The Pride Center has provided evidence that this policy does not apply to work-study employees, but ISU's skepticism of that appears justified by plan's express application to "volunteer, intern, staff, and facilitator opportunities." *See id.*; dkt. 25 at 27. Since ISU was not aware of this policy when it terminated its partnership with the Pride Center, the Court does not consider it in evaluating whether the Pride Center is likely to succeed on its claim that the termination discriminated based on viewpoint. *See* dkt. 25 at 7.

11

The Pride Center argues that ISU has not shown that the "LGBTQIAP+ affirming" job requirement constitutes unlawful viewpoint discrimination under applicable laws. But even if so, that is not enough to establish a likelihood of success on its First Amendment claim. Instead, ISU can make viewpoint-neutral decisions based on legal uncertainties and risk evaluations from an institutional perspective without violating the First Amendment. *See Walker*, 705 F.3d 640, 646. Therefore, regardless of whether the Pride Center's job requirement violates applicable antidiscrimination laws, ISU does not discriminate based on the Pride Center's viewpoint by concluding that the Pride Center's job requirement places ISU at risk of violating applicable antidiscrimination laws as interpreted and enforceable by the DOJ. *See Christian Legal Society v. Walker*, 453 F.3d 853, 861 (7th Cir. 2006) (addressing "the threshold question" of whether the university's "stated grounds for derecognition actually applies").

The Pride Center resists that conclusion by arguing that ISU could not have relied on the Department of Justice memo because it terminated the Pride Center partnership on July 28, 2025, before that memo was issued on July 29. Dkt. 20 at 20–21. But the record instead reflects that ISU initially put a decision on hold pending further information:

> From: Nancy Rogers <Nancy.Rogers@indstate.edu>
> Date: Monday, July 28, 2025 at 10:24 AM
> To: Carrie Lutz <Carrie.Lutz@indstate.edu>
> Subject: RE: Federal work study partner list
>
> Carrie,
>
> Do we actually have a student working at the Burmese American Community Institute? If not, please take them off the list.
>
> For now, can we go ahead with everyone except BACI and the Pride Center?
>
> Does anyone in the CC have a contact at Ball State? I'd be interested in learning what they are doing in regards to any community organizations that have a DEI focus.

EXHIBIT 14

Dkt. 20-2 at 199; *accord* dkt. 24-1 at 53–55 (Lutz 30(b)(6) dep. at 52–54) (explaining that, on July 28, "Nancy needed more information to be able to understand whether or not we can move forward based upon the materials that were provided" so "[t]hey were put on pause").  The Pride Center has not contested ISU's designated evidence that this initial decision to further evaluate its relationship with the Pride Center was based on DOJ guidance issued in February and May of 2025.  Dkt. 24-5 at 3–4 ¶¶ 8–9.  This undermines any inference that ISU's initial decision to put the Pride Center's work-study funds on hold was motivated by the Pride Center's viewpoints rather than ISU's desire to evaluate whether its affiliation with the Pride Center presented legal risk.

      The Pride Center therefore has not cast doubt on ISU's evidence that it made its final decision after reviewing the July 29, 2025, DOJ guidance, along with "the prior guidances, recent Indiana state law and executive orders, and the Pride Center's job description for its Federal Work-Study and Sycamore Community Work program positions."  *Id.* at 4 ¶ 10.  At that point, "ISU—with the advice of counsel—decided not to renew its Federal Work-Study agreement with the Pride Center for the 2025-2026 academic year."  *Id.*  That decision was

13

communicated internally and to the Pride Center on August 8, more than a week after the Department of Justice's guidance. Dkt. 20-2 at 184, 205–06.

      Next, the Pride Center contends that content discrimination can be inferred because other organizations did not have their partnerships cancelled despite a focus on "equity and inclusion." Dkt. 20 at 13–14, 23–24. The position descriptions for those organizations, however, generically require the ability to "work effectively with a diverse community" and list "Equity and Inclusion" as one of its "Career Readiness Competencies" alongside other general skills like "Leadership," "Teamwork," "Critical Thinking," and "Work Ethic." Dkt. 20-3 at 25, 28–31, 35–37, 41–44, 61–64, 67 (work-study position descriptions for Baptist Collegiate Ministry, CANDLES Museum, Happiness Bag Special Olympics, and United Campus Ministries). The Pride Center also cites several organizations' websites to show that their work involves protected characteristics like religion, ethnicity, and disability. It has not, however, cited evidence that any of those organizations required ISU work-study students to hold particular viewpoints related to protected characteristics. *See* dkt. 20 at 13–14. So, the Pride Center has not shown that any of those organizations had a job requirement comparable to its requirement that work-study students be "LGBTQIAP+ affirming and culturally responsive." Dkt. 20-2 at 167–183; 235–250; dkt. 24-8. Therefore, the Pride Center's evidence and arguments about other organizations ISU partners with for work-study positions do not, at this stage, undermine ISU's evidence that it terminated the partnership because of legal concerns about the Pride Center's job requirement as described in the

14

position description, rather than because of an LGBTQ+ viewpoint.  Dkt. 20-2 at 43–45, 62–64; *cf. Walker*, 705 F.3d at 650 ("That the benefits of Act 10's subsidy may fall more heavily on groups with one particular viewpoint does not transform a facially neutral statute into a discriminatory one.").

Finally, the Pride Center argues—for the first time in reply—that "ISU has a lamentable recent pattern regarding LGBTQ issues on campus." Dkt. 27 at 8–9.  It points to evidence that ISU previously did not allow a Pride Fest on campus; cancelled a social work course's site visit to the Pride Center; and cancelled a drag show performance associated with an art installation "Celebrating Queer Graphic Arts." *Id.*  This argument is waived.  *Int'l Assoc. of Fire Fighters, Local 365 v. City of E. Chicago*, 56 F.4th 437, 452 (7th Cir. 2022).  Moreover, the Pride Center designates no evidence that the two Defendants here—ISU's Vice-President for University Engagement and Director, Career Services—were involved in those decisions and cites no authority supporting the use of prior events like these to infer viewpoint discrimination in a separate decision.  *See* dkt. 27 at 8–9.

In short, the Pride Center has not provided evidence to show that ISU's decision to not fund the Pride Center's work-study positions was based on the Pride Center's viewpoint regarding LGBTQ+ issues.  The Pride Center therefore has not shown a substantial likelihood of success on its First Amendment claim.[4]  *See Doe v. Univ. of Southern Indiana*, 43 F.4th 784, 800 (7th Cir. 2022)

---

[4] Because the Pride Center has not shown a substantial likelihood of success on the merits justifying a preliminary injunction, the Court does not consider the other

15

(The moving party "must show a likelihood of success on the merits, not mere a 'better than negligible' chance.").

## IV.
## Conclusion

The Pride Center's motion for preliminary injunction is **DENIED**. Dkt. [11].

**SO ORDERED.**

Date: 1/21/2026

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All electronically registered counsel

---

preliminary injunction factors.  *See Halczenko v. Ascension Health*, 37 F.4th 1321, 1326 (7th Cir. 2022).